Jonathan R. MacBride
ZELLE LLP
401 Plymouth Road
Suite 120
Plymouth Meeting, PA 19462
484-532-5330
jmacbride@zelle.com

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| AUTOHAUS ACQUISITIONS, INC., on behalf of itself and all others similarly situated, <br><br>         Plaintiff, <br><br> v. <br><br> AUDI AG; VOLKSWAGEN GROUP OF AMERICA, INC. D/B/A VOLKSWAGEN OF AMERICA, INC. AND D/B/A AUDI OF AMERICA, INC.; BMW AG; BMW OF NORTH AMERICA, LLC; DAIMLER AG; MERCEDES-BENZ USA, LLC; DR. ING. H.C. F. PORSCHE AG; PORSCHE CARS NORTH AMERICA, INC.; VOLKSWAGEN AG, <br><br>         Defendants. | Case No. <br><br> CLASS ACTION COMPLAINT <br><br> <u>JURY TRIAL DEMANDED</u> |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ........................................................................ 1

II.     JURISDICTION AND VENUE .................................................................... 3

III.    PARTIES ...................................................................................................... 4

      A.      PLAINTIFF.......................................................................................... 4

      B.      DEFENDANTS .................................................................................... 5

          The Audi Defendants ............................................................................ 5

          The BMW Defendants .......................................................................... 6

          The Daimler Defendants ....................................................................... 7

          The Porsche Defendants ........................................................................ 8

          The Volkswagen Defendants ................................................................. 8

IV.     THE MARKET FOR PASSENGER CARS.................................................. 9

V.      DEFENDANTS' UNLAWFUL CONDUCT ............................................... 11

VI.     THE DEFENDANTS' CONDUCT WAS THE PRODUCT OF AN AGREEMENT
      AND/OR CONCERTED ACTION ............................................................. 17

VII.    THE CARTEL AGREEMENT AND/OR CONCERTED ACTION VIOLATED THE
      SHERMAN ACT AND CAUSED PLAINTIFF AND THE DIRECT PURCHASER
      CLASS ECONOMIC HARM..................................................................... 19

VIII.   DEFENDANTS ENGAGED IN UNLAWFUL CONDUCT IN, AND DIRECTED AT,
      THE FORUM............................................................................................. 19

IX.     DEFENDANTS FRAUDULENTLY CONCEALED THE CARTEL AGREEMENT ... 20

X.      CLASS ALLEGATIONS ........................................................................... 22

XI.     CLAIM FOR RELIEF:  VIOLATION OF SHERMAN ACT SECTION 1 ............... 24

XII.    PRAYER FOR RELIEF ............................................................................. 24

XIII.   JURY DEMAND ....................................................................................... 25

## I.    NATURE OF THE ACTION

1.    For more than 20 years, Defendants – Germany's biggest automakers – secretly engaged in a cartel to artificially generate supra-competitive profits by agreeing to reduce product quality, deter innovation, and not fully compete against each other for sales of millions of passenger cars ("German Cars") that they sold in the United States ("the Cartel Agreement").

2.    Defendants agreed to hide the long-running Cartel Agreement because they knew that their conduct was unlawful and, if the truth was discovered, it would harm Defendants' carefully cultivated reputation for "German engineering."  For example, if purchasers knew that German Cars were really the product of a cartel, those purchasers would not have paid the prices that they did -- prices that were potentially "far too high" for German Cars (Klaus Mueller, Executive Director of The Federation of Consumer Organizations ("Verbraucherzentrale Bundesverband e.V. – vzbv")).[1]

3.    Although details of the scope and extent of the secret cartel are just now beginning to see the light of day, this much is already known:  at least four Defendants have reportedly admitted they participated in suspected cartel infringements with each other and the other Defendants.  Defendants participated in literally thousands of cartel-related meetings over a time span dating back to at least 1996.  The Cartel Agreement included schemes on, *inter alia*, technical specifications for mechanical attachments, such as braking control systems, emissions, seating systems, air suspensions, clutches, gasoline engines, and diesel engines in order to achieve supra-competitive profits.  Defendants further agreed not to compete against each other on the basis of new technologies or innovations.  By substituting collusion for competition, Defendants interfered with market forces and deprived consumers of choice.  But for the Cartel

---

[1] http://www.hurriyetdailynews.com/cartel-probe-looms-over-german-car-industry-.aspx?pageID=238&nid=115901.

Agreement, Defendants would have competed to provide the best products at the lowest prices to United States consumers.

4.      United States antitrust laws exist to deter precisely the kind of conduct in which Defendants engaged.  As the U.S. Supreme Court wrote nearly 60 years ago in *Northern Pacific Railway v. United States*, 356 U.S. 1, 4 (1958), Congress enacted the Sherman Act because "the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress."  The Cartel Agreement wholly undermined the goals of the Sherman Act and the process of competition to the detriment of United States consumers.

5.      While the full scope of the Cartel Agreement is known only to Defendants, the fact of the Cartel Agreement cannot be credibly disputed because Defendants have admitted it existed.  The details of the cartel are reportedly documented in agendas, minutes, and memoranda secretly maintained by Defendants (some of which are now in the possession of antitrust authorities).

6.      As a proximate result of the Cartel Agreement, United States consumers – including Plaintiff and the proposed class -- were deprived of the benefits of unrestrained competition and suffered economic injury.  Defendants sought, and extracted, supra-competitive prices by foregoing competition against each other and by falsely representing that their respective brands offered superior "German" technology.  The extent of the economic injury suffered can be reliably quantified only after exposure of the details of the Cartel Agreement.  As the United States recently wrote in a submission to the OECD regarding The Role and Measurement of Quality in Competition Analysis (2013), "Quality can be manifested in a variety

of ways across markets, and it is not always as easy to quantify as prices, ***but it is no less***

***important***."[2] (emphasis added).

7.      Plaintiff seeks certification of its claims as a class action on behalf of all direct

purchasers of German Cars in the United States ("Direct Purchaser Class").

## II.      JURISDICTION AND VENUE

8.      Plaintiff brings this action under Sections 4 and 16 of the Clayton Act (15 U.S.C.

§§ 15, 26) to recover treble damages and the costs of this suit, including reasonable attorneys'

fees, as well as injunctive relief, against Defendants for the injuries proximately caused to

Plaintiff and members of the Class by Defendants' violations of Section 1 of the Sherman Act.

Defendants are jointly and severally liable for all damages proximately caused to Plaintiff and

the class members by Defendants' violation of the Sherman Act.

9.      The Court has jurisdiction over the subject matter of this action pursuant to

Sections 4 and 16 of the Clayton Act, Section 1 of the Sherman Act, and Title 28, United States

Code, Sections 1331 and 1337.

10.      Venue is proper in this Judicial District under Sections 4(a) and 12 of the Clayton

Act (15 U.S.C. §§ 12, 22), and 28 U.S.C. § 1391(b), (c), and (d) because a substantial part of the

events giving rise to Plaintiff's claims occurred in this District, and a substantial portion of the

affected interstate trade and commerce was carried out in this District.

11.      This Court has personal jurisdiction over each of the Defendants because each

Defendant, either directly or through the ownership and/or control of its United States

subsidiaries (a) transacted business in the United States, including this District; (b) directly or

indirectly sold or marketed substantial quantities of German Cars throughout the United States,

---

[2] http://www.oecd.org/competition/Quality-in-competition-analysis-2013.pdf.

including this District; (c) had substantial aggregate contacts with the United States as a whole, including this District; (d) carried out conspiratorial schemes in the United States, including this District; and (e) was engaged in an illegal conspiracy to suppress technological advancement that was directed at, and had a direct, substantial, reasonably foreseeable and intended effect of causing injury to, the business or property of persons or entities residing in, located in, or doing business in this District and throughout the United States, including Plaintiff and the proposed class.

12.    Defendants' conspiracy substantially affected commerce throughout the United States because Defendants, directly or through their agents, produced, promoted, sold, marketed, and/or distributed passenger cars throughout the United States, including this District, thereby purposefully availing themselves of the laws of the United States and this District.

13.    The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have, a substantial effect on interstate commerce of the United States. Defendants' products are sold in the flow of interstate commerce, and Defendants' activities had a direct, substantial and reasonably foreseeable effect on such commerce.

III.    **PARTIES**

   A.    **PLAINTIFF**

14.    Plaintiff Autohaus Acquisitions, Inc. ("Autohaus"), is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, with its corporate office in Ephrata, Pennsylvania and sales facility in Harrisburg, Pennsylvania.  From 2000-2010, Autohaus was a licensed and authorized dealer for the sales and service of Volkswagen-branded vehicles.  From 2000-2008, Autohaus was a licensed and authorized dealer for the sales and service of Audi-branded vehicles.  Following the sale of its Audi and VW franchises, Autohaus

relocated its corporate offices to Florida.  During the relevant time period, Autohaus purchased German Cars directly from Defendants.

**B.    DEFENDANTS**

**The Audi Defendants**

15.    <u>Defendant Audi AG</u> is a German corporation based in Ingolstadt, Germany. Audi AG is approximately 99.55% owned by Volkswagen AG.  During the relevant period, Audi AG continuously engaged in business in the United States by, *inter alia*, interacting with its wholly owned subsidiary in the United States, Audi of America, Inc., an organizational unit of Defendant Volkswagen Group of America, Inc. ("VWGoA"), in Herndon, Virginia.  Audi AG regularly submitted information to VWGoA necessary for VWGoA to complete required applications to obtain certificates of conformity needed to sell Audi-branded vehicles in the United States.  Audi AG delivered and/or arranged for delivery of its cars to the United States with the intent to market and sell them in all 50 states.  In addition, as set forth more fully below, Audi AG expressly aimed the unlawful conduct alleged in this Complaint at the United States.

16.    Audi of America, Inc. is an organizational unit of <u>Defendant Volkswagen Group of America, Inc.</u>, which is a New Jersey corporation doing business in every state and the District of Columbia, with its principal place of business in Herndon, Virginia.  During the relevant period, Audi of America, Inc. was continuously doing business through a chain of distributors and dealers in the United States, including within this District, by advertising, promoting, distributing, and selling Audi cars.  In 2016, Audi AG sold more than 200,000 vehicles into the U.S. market to some 290 dealers nationwide through Audi of America, Inc.  On information and belief, Audi of America, Inc. was aware of, and party to, the Cartel Agreement.

17.    Audi AG directed the operations of Audi of America, Inc., which acted as Audi AG's agent in the United States during the relevant period.

18.     In January 2017, VW AG pled guilty to federal criminal charges of conspiracy, obstruction of justice, and entry of goods by false statement in the United States District Court for the Eastern District of Michigan.  VW AG entered the plea on behalf of (a) itself, (b) Audi AG, and (c) VWGoA.  In a Statement of Facts ("SOF") accompanying the plea, VW AG admitted that VW AG, Audi AG, and VWGoA acted through their respective employees.  As explained in the SOF, VW AG treated itself, Audi AG, and VWGoA as a single entity, "VW."  VW AG admitted that during a portion of the relevant period, "VW sold, offered for sale, introduced into commerce, delivered for introduction into commerce, imported, or caused the foregoing actions" of a number of different vehicle types and brands into the United States.

### The BMW Defendants

19.     Defendant Bayerische Motoren Werke AG ("BMW AG") is a German vehicle, motorcycle, and engine manufacturer.  With its subsidiaries, BMW AG develops, manufactures, and sells cars and motorcycles worldwide, including German Cars, which were purchased in this District and throughout the United States during the relevant period.  According to its website, the parent company, BMW AG, also distributes BMW motor vehicles for sale to U.S. consumers.

20.     Defendant BMW of North America, LLC ("BMW North America") is a Delaware limited liability corporation.  BMW North America's Corporate Headquarters, Eastern Regional Headquarters, and Technical Training Center are located in Woodcliff Lake, New Jersey.  BMW North America designed the vehicles at issue in this action specifically for sale in the United States in conjunction with its parent BMW AG, and to appear to meet United States and California standards regarding emissions compliance and other regulations. In addition to marketing and sales, the company has a financial services arm for its brands.  The BMW sales

organization is represented in the U.S. through a networks of passenger car and Sports Activity Vehicle centers. On information and belief, BMW North America was aware of, and party to, the Cartel Agreement.

21. Upon information and belief, the cartel involved numerous other persons, partnerships, sole proprietors, firms, corporations, and entities not presently named as defendants in this lawsuit. Individuals, whose identities are unknown, have participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anticompetitive conduct.

**The Daimler Defendants**

22. Defendant Daimler AG ("Daimler") is a foreign corporation headquartered in Stuttgart, Germany. Daimler designed, engineered, manufactured, tested, marketed, supplied, sold, and distributed certain of the vehicles at issue in this Complaint specifically for sale in the United States, including in this District, during the conspiracy period. Daimler also developed, reviewed, and approved the marketing and advertising campaigns designed to sell Mercedes-Benz branded automobiles in the United States. Through its wholly owned subsidiaries and agents, Daimler continuously marketed its products in the relevant period in the United States, including in this District.

23. Defendant Mercedes-Benz USA, LLC ("MBUSA") is a Delaware limited liability corporation with its principal place of business in Atlanta, Georgia. MBUSA was at all relevant times a wholly owned subsidiary of Daimler. MBUSA designed the vehicles at issue in this action specifically for sale in the United States. MBUSA employs over 1,600 U.S. workers and has approximately 380 associated dealerships in the U.S in the U.S. On information and belief, MBUSA was aware of, and party to, the Cartel Agreement.

**The Porsche Defendants**

24.    Defendant Dr. Ing. h.c. F. Porsche AG ("Porsche AG") is a German corporation with its principal place of business located in Stuttgart, Germany.  Prior to 2011, Porsche AG was an independent entity.  In 2011, it became a wholly owned subsidiary of Volkswagen AG. Porsche AG designed, developed, manufactured, and sold certain of the vehicles at issue throughout the United States, including this District, during the relevant period.

25.    Defendant Porsche Cars North America, Inc. ("PCNA") is incorporated in Delaware with its principal place of business in Atlanta, Georgia.  PCNA is a wholly owned U.S. subsidiary of Porsche AG. PCNA is the exclusive importer of Porsche-branded vehicles for PCNA. It sells the vehicles at issue in this action to a network of independent dealers in the United States. These vehicles are designed to meet United States and California standards regarding emissions compliance and other regulations.  On information and belief, PCNA was aware of, and party to, the Cartel Agreement.  In 2016, PCNA sold more than 50,000 German Cars to franchised dealers in the United States.

**The Volkswagen Defendants**

26.    Defendant Volkswagen AG ("VW AG"), also known as Volkswagen Group ("VW Group"), is a German corporation with its principal place of business in Wolfsburg, Germany.  VW AG is one of the world's largest automakers by sales.  It designs, develops, manufactures, and distributes automobiles worldwide.

27.    VW AG and the VW Group are managed by VW AG's Board of Management. VW AG wrote in its 2016 Annual Report that each brand in the VW Group was managed by a board of management, "which ensures its independent and separate development and business operations."  As shown below, that statement was false because Defendants secretly coordinated

their development and business operations.  VW AG reports consolidated financial statements that incorporate its subsidiaries.

28.     VW AG develops vehicles and components for the VW Group's brands.  It also produces and sells passenger cars for the VW brand.  During the relevant period, VW AG sold passenger cars and delivered, and/or arranged for delivery of passenger cars to the United States. In addition, as set forth more fully below, VW AG expressly aimed the unlawful conduct alleged in this Complaint at the United States.  VW AG is the ultimate parent corporation of Defendant Volkswagen of America, Inc.  Further, VW AG regularly submitted to its wholly owned U.S. subsidiary, VWGoA, the paperwork necessary to complete required applications needed to obtain certificates of conformity for a significant number of vehicles sold by VW AG in the United States.  VWGoA is a New Jersey corporation headquartered in Herndon, Virginia that houses the U.S. operations of the VW and Audi brands.  VWGoA is VW AG's principal North American subsidiary.  It does business, operates, markets, and sells cars in all 50 states and the District of Columbia.  The company has approximately 6,000 employees in the United States and sells its vehicles through a 1,000-dealer network with more than 30 corporate/subsidiary locations.

## IV.    THE MARKET FOR PASSENGER CARS

29.     Passenger vehicles are the most common mode of transportation in the United States.  The U.S. Department of Transportation ("DOT") defines a passenger vehicle (with certain stated exceptions) as any four-wheeled vehicle that is propelled by fuel, or by alternative fuel, manufactured primarily for use on public streets, roads, and highways and rated at less than 10,000 pounds gross vehicle weight.  DOT further defines a passenger vehicle as any automobile manufactured primarily for use in the transportation of not more than 10 individuals.

30.    Each year, more than 13 million passenger vehicles are sold into the United States.  In 2016, Defendants collectively sold more than 1 million passenger vehicles in this country.  The market for passenger vehicles can be loosely broken down into sub-segments of small (compact) cars, mid-size cars, SUVs, luxury cars (including luxury SUVs), and pickup trucks.  Defendants Audi, BMW, Daimler, and Porsche participated primarily in the luxury car segment.  Defendant VW also participated in that segment to a lesser extent.  Defendants BMW, Mercedes, and Audi dominate the market for luxury cars, with an estimated combined 80% global share in that market.[3]

31.    Consumers perceive luxury cars as the vehicles manufacturers use as testing grounds for technological innovation.  End consumers in these segments tend to be more affluent and value brand, image, quality, and innovation.

32.    Accordingly, purchasers are willing to pay a premium for those qualities in a car. As one example, in 2012, Porsche AG reported per-car profits of more than $22,000 per car – a profit margin of some 17% or more.[4]  Other Defendants also reported high profit margins ranging from 8-11% through the conspiracy period.[5]  Defendants would not have been able to sustain these profit margins in the absence of the Cartel Agreement.  Defendants were well aware that end consumers would pay for premium technology and touted "German engineering" as a differentiating quality that allowed them to charge higher prices for their branded German Cars.

33.    Passenger cars are sold in the United States to a network of independent dealers. Most states have enacted franchise laws that prohibit automobile manufacturers from selling

[3] http://www.prnewswire.com/news-releases/global-luxury-car-market-report-2017---research-and-markets-300475704.html.

[4] http://www.dw.com/en/porsche-emerges-as-worlds-most-profitable-carmaker/a-16727077.

[5] *See, e.g.,* https://www.forbes.com/sites/neilwinton/2014/05/06/premium-car-maker-bmw-of-germany-expected-to-continue-hot-profit-streak/#37c717ba961e.

directly to end consumers in the United States. In the typical case, an automobile manufacturer will enter into an agreement ("Franchise-Dealer Agreement") with the dealer in which the dealer obtains the right to purchase passenger vehicles from the manufacturer and to re-sell those vehicles to individuals in the United States.

34.    Dealers, including Plaintiff, collectively paid Defendants millions of dollars to enter into Franchise-Dealer Agreements. Dealers often enter Franchise-Dealer Agreements with more than one manufacturer at a time, which allows them to purchase and re-sell multiple automobile brands.

35.    Dealers provide a wide range of services that are essential to the effective and efficient distribution of passenger cars in the United States. Dealers fulfill at least three functions: sales, service/support, and maintaining brand image. Dealers collectively employ more than one million workers in the United States. Franchise-Dealer Agreements gave Defendants the right to determine the prices they charge the dealer for German Cars. Franchise-Dealer Agreements also contained numerous other promises and assurances from the franchisor. For example, a recent Audi Franchise-Dealer Agreement states in its standard provisions that Audi will refrain from conduct "inconsistent with the public interest and avoid all discourteous, deceptive, misleading, unprofessional or unethical practices."[6]

## V.    DEFENDANTS' UNLAWFUL CONDUCT

36.    To the best of Plaintiff's knowledge, information, and belief, Defendants entered into a secret Cartel Agreement in or around 1996, at a time when Japanese automotive manufacturers were making gains in the luxury car segment. Rather than independently compete on the merits to meet the challenge presented by these rival car makers, the purpose of

---

[6] *See, e.g.*, https://tinyurl.com/ybu6ygkr.

Defendants' cartel (which one publication labeled "German Cars Inc.") was to suppress competition among Defendants while maintaining the façade that they were continuing to aggressively innovate and provide the highest quality products.[7]  As part of the Cartel Agreement, Defendants secretly coordinated their development and marketing programs and surreptitiously agreed on technological limitations to reduce production costs and artificially maintain their supra-competitive profit margins.[8]

37.    During the life of the cartel, Defendants met hundreds of times each year to refine, expand, and implement the Cartel Agreement.[9]  Cartel meetings often occurred under the cover of trade associations, including the Verband der Automobilindustrie ("VDA") and the German Automobile Association.[10]  In these secret meetings, Defendants reached agreements to limit technological innovation, share competitively sensitive commercial information about the key aspects of the other Defendants' design and manufacture of passenger automobiles, coordinate their marketing of German Cars, and stabilize market shares.[11]

38.    During the conspiracy, Defendants also exchanged confidential information concerning a variety of technological issues.  Defendants collectively established rules regulating technical standards that specified that no one manufacturer could be far enough ahead of another in terms of innovations such that another would lose sales.  According to *Der Spiegel*, "If a manufacturer introduced a groundbreaking technology, the others had to be capable of also

---

[7] Frank Dohmen & Dietmar Hawranek, *Collusion Between Germany's Biggest Carmakers*, Der Spiegel (July 27, 2017), http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html, incorporated by reference.

[8] Dohmen and Hawranek, supra n.7.

[9] Dohmen and Hawranek, supra n.7.

[10] Dohmen and Hawranek, supra n.7.

[11] Dohmen and Hawranek, supra n.7.

offering the technology relatively quickly."[12]  That aspect of the Cartel Agreement ensured that no one Defendant could seek to gain market share at the expense of the others.  But for that aspect of the Cartel Agreement, Defendants who lacked a breakthrough technology would have competed more strenuously on price to gain or maintain market share while simultaneously attempting to develop their own competing technology.

39.     The most notorious example of Defendants' collusion is the coordination on the development of diesel engines and the emissions control systems those engines required to comply with United States emissions regulations.  Defendants began this coordination under the Cartel Agreement when faced with the development of hybrid electric cars and the competitive threat such cars posed to Defendants.  In the absence of the Cartel Agreement, each Defendant would have competed to meet United States emissions regulations at the lowest cost and price. This competition would have exerted downward pressure on the prices that Defendants charged for their passenger cars with diesel engines as each Defendant sought to gain or maintain market share.

40.     Rather than independently respond to the development of hybrid vehicles, Defendants agreed instead to market diesel engines as the "clean" alternative to gasoline-burning vehicles, and coordinated on the specifics of how the diesel technology would be implemented, and on ways in which they would collectively misrepresent the emissions produced by diesel engines.  As is now well known, diesel engines produce a pollutant known as nitric oxide which is subject to emissions regulations in the United States.  Defendants agreed to secret standards, including size limits for tanks that hold a chemical (urea) used to implement "clean diesel" technology.  Defendants further agreed to conceal the fact of this aspect of the Cartel Agreement

---

[12] Dohmen and Hawranek, supra n.7.

so that U.S. regulators and German Car buyers would not know that the supposed "clean diesel" technology was insufficient, fraudulently marketed, and would in fact produce nitric oxide in excess of U.S. regulatory limits.[13]

41.     In May 2014, Audi warned other Defendants that unilateral efforts to increase the size of the chemical (urea) tanks would result in an "arms race" that Defendants should avoid.[14] The "arms race" to which Audi referred is merely a euphemism for competition.  But for the Cartel Agreement, the forces of competition would have led each Defendant to develop passenger cars that met U.S. emission standards and otherwise met the standards of the "German engineering" that Defendants touted in support of their respective brands and to justify the supra-competitive premium prices they charged to Plaintiff and all direct purchasers of German Cars in the U.S.

42.     As other examples of Defendants' efforts to suppress competition and deter innovation, (a) one working group set the maximum speed at which convertible roofs could be opened and closed (50 kilometers per hour); (b) a "clutch working group" discussed when parking locks should be activated in German passenger cars; (c) another working group (dealing with a technology that has not yet been publicly disclosed) specifically sought clarification as to whether there was a standstill agreemen" to restrain further innovations; (d) a "third-party motor analysis" working group shared data so frequently its members joked about "give and take" among them; and (e) working groups existed to focus on brake controls and seat systems.[15]

43.     Defendants routinely shared commercially sensitive data that, in the absence of a cartel, each Defendant would have gone to great lengths to protect from disclosure because the

---

[13] Dohmen and Hawranek, supra n.7.

[14] Dohmen and Hawranek, supra n.7.

[15] Dohmen and Hawranek, supra n.7.

data included highly confidential trade secrets. The working groups were aware of the potential for antitrust liability, consciously maintained secrecy to avoid exposure of the Cartel Agreement and the cartel members' misconduct, and, in at least one instance, expressed concern that another manufacturer who was not party to the Cartel Agreement might complain to the German Cartel Office.

44. Even as they secretly agreed to and did suppress innovation, Defendants publicly promoted their cars as highly sophisticated vehicles with the latest technology for which Plaintiffs and all direct purchasers of German Cars should – *and did* – pay a premium. For example, VW promoted "the power of German engineering,"[16] BMW touted its vehicles as "the ultimate driving machine[s]" due to their advanced "performance, design, innovation and efficiency,"[17] Daimler extolled its historical practice of "[l]eading through innovation,"[18] Audi regularly promoted its German engineering prowess (its North American slogan was "Isn't it time for German engineering?"),[19] and Porsche claimed that "there is no substitute" and that it had a long-standing reputation for developing "technologies that have advanced vehicle performance, improved safety and spurred environmental innovations within the automotive industry."[20]

---

[16] *See, e.g.*, https://phi325.wordpress.com/2015/09/24/volkswagen-commercial-thats-the-power-of-german-engineering/.

[17] Vehicles, BMW: THE ULTIMATE DRIVING MACHINE, https://www.bmwusa.com/vehicles/bmwi.html.

[18] *See, e.g.,* https://www.mbusa.com/mercedes/benz/innovation.

[19] *See, e.g.,* http://adage.com/article/cmo-strategy/audi-s-truth-engineering-ads-back-bite-amid-probe/300472/.

[20] http://press.porsche.com/news/release.php?id=505.

45.     In 2014, Daimler confidentially informed German authorities of the cartel's existence and membership.[21]  Daimler disclosed this information to obtain leniency from antitrust authorities.  Daimler's disclosure to the authorities was not publicly revealed at the time.  Nor did Daimler tell its co-conspirators about its disclosures to cartel authorities.  It simply began to avoid conspiracy meetings.  For example, one purported set of cartel meeting memorandums complained that "The Daimler representatives in the working group on the after-treatment of exhaust gases continue to leave much to be desired."[22]

46.     On July 4, 2016, Volkswagen AG filed a proffer with the European Commission acknowledging "suspected cartel infringements."[23]  According to one public report, Volkswagen AG conceded that Defendants colluded "'-- at least since the 1990s and to this day'" regarding, *inter alia*, the development of their vehicles, costs, and markets.[24]  BMW's Chairman Harold Krueger was asked in September 2017 whether BMW was "part of a cartel?"  Krueger replied "there is nothing official (in terms of charges) as far as we know, but we are taking this serious. We are analyzing this internally, most of it goes back to the 1990s."[25]  On information and belief, Defendants agreed not to pass on their cost savings to their customers, as they would have done in the absence of the Cartel Agreement.  Indeed, had Defendants been able to pass costs on, they would not have needed to conspire to do so.

---

[21] Dohmen and Hawranek, supra n.7.

[22] Dohmen and Hawranek, supra n.7.  In 2011, the EC raided four makers of heavy trucks, including Daimler and Volkswagen Group's MAN.  The EC ultimately fined Daimler €1.1 billion, whereas MAN paid nothing because it cooperated with authorities.  *Id.*

[23] Dohmen and Hawranek, supra n.7.

[24] Dohmen and Hawranek, supra n.7.

[25] https://www.irishtimes.com/business/transport-and-tourism/bmw-boss-addresses-emissions-and-cartel-allegations-head-on-1.3218025.

47.     According to news sources, Volkswagen claims the Cartel Agreement included five main groups: drive, set-up, chassis, electricity/electronics, and total vehicle.  Within these five groupings, five dozen task forces conspired with respect to mechanical components, brakes, seat systems, suspensions, gasoline and diesel engines, clutches and transmissions, as well as exhaust treatment systems.[26]  Certain German Defendants have confidentially produced numerous documents to antitrust authorities, in at least seven sets of submissions, regarding their anticompetitive behavior.[27]  Volkswagen reportedly began producing such documents in 2016.

48.     The development and maintenance of the Cartel Agreement was supported by a culture of collusion in which executives of Defendants viewed competition law violations as "harmless rule violations, on a par with parking tickets."[28]

## VI.    THE DEFENDANTS' CONDUCT WAS THE PRODUCT OF AN AGREEMENT AND/OR CONCERTED ACTION

49.     The existence of the Cartel Agreement is confirmed by admissions made by Defendants to regulatory authorities.  At present, only the Defendants know the full scope of the Cartel Agreement.  The evidence of the Cartel Agreement's reach and details are exclusively in the possession of the Defendants.  Defendants possess agendas, minutes, and memoranda that will more fully identify the scope of the Cartel Agreement once disclosed in discovery.  In addition to certain Defendants' reported admissions to antitrust authorities, several "plus factors" demonstrate the fact of the agreement.

50.     First, Defendants had a strong motive to conspire.  In the mid-1990s, Japanese and other auto manufacturers were making inroads with United States consumers in the luxury car segment by offering advanced technologies at competitive prices.  To meet that threat,

---

[26] Dohmen and Hawranek, supra n.7.

[27] Dohmen and Hawranek, supra n.7.

[28] Dohmen and Hawranek, supra n.7.

Defendants were faced with the prospect of spending more on research and development ("R&D") and sacrificing profit margins to maintain their reputation as the most technologically sophisticated cars in the world and, thus, preserve their market share. Each Defendant sought to avoid an "arms race" that would have reduced their profit margins.[29] Defendants were also motivated to keep this conduct secret because, if exposed, it would not only have led to criminal investigations, it would have diminished Defendants' reputation, harmed the value of their respected brands, and impaired their ability to extract premiums based on that reputation. Notably, the stock prices for Defendants all dropped precipitously after disclosure of the antitrust investigation.

51.    Second, Defendants had and took advantage of literally thousands of opportunities to conspire through secret meetings. It has been reported that approximately 60 employees of Defendants met under the cover of numerous trade association meetings to effectuate the Cartel Agreement. The fact that Defendants conducted these meetings in secret reflects a consciousness of guilt, supports the inference of unlawful agreement, and confirms certain Defendants' admissions of cartel conduct.

52.    Third, Defendants engaged in conduct inconsistent with their independent self-interests by, *inter alia*, disclosing to each other proprietary technological information and trade secrets. In the absence of a conspiracy, a company's trade secrets and proprietary information are among a company's most valuable assets. In a truly competitive environment, protecting those essential resources is critical to maintaining a company's competitive edge. In the absence of agreement, Defendants individually would have used their secret proprietary information to innovate and attract consumers to their respective brands.

---

[29] Dohmen and Hawranek, supra n.7.

53.     Fourth, Defendants have a long history of prior conspiratorial conduct.

54.     Fifth, the structure of the industry was conducive to successful collusion.  There are a small number of German car makers that possess substantial market power.  There are high barriers to entry in the market for luxury cars.  Dealers had limited bargaining power.  There were multiple transactions for German Cars and the widespread sharing of information among Defendants could be (and was) used to enforce the terms of the Cartel Agreement.  Defendants also sought to promote product homogeneity.

## VII.    THE CARTEL AGREEMENT AND/OR CONCERTED ACTION VIOLATED THE SHERMAN ACT AND CAUSED PLAINTIFF AND THE DIRECT PURCHASER CLASS ECONOMIC HARM

55.     The Cartel Agreement was a horizontal agreement to restrict competition on quality, innovation, and price.  As such, it constitutes a *per se* violation of the Sherman Act.  In addition, insofar as Defendants agreed that they would cap technological innovations so that no German Car Defendant would lose sales to another German Car Defendant, that constituted a form of market share agreement that also is treated as a *per se* violation.

56.     As a proximate result of the Cartel Agreement, Defendants reduced product quality, restricted innovation, and effectively increased prices for German Cars.  The Cartel Agreement proximately caused Plaintiff and all direct purchasers of German Cars in the U.S to suffer unique harm in several respects, including receiving lower quality products and paying supra-competitive prices for those inferior products.

## VIII.   DEFENDANTS ENGAGED IN UNLAWFUL CONDUCT IN, AND DIRECTED AT, THE FORUM

57.     The market for passenger cars is geographically limited to the United States because the United States and the states enforce federal and state laws that differ from laws applied by other countries.  Passenger cars sold to Plaintiff and the Direct Purchaser Class thus

had to be specifically designed to meet federal and state regulations and, in at least one case, Defendants explicitly colluded to evade emissions standards unique to the United States. Defendants thus expressly aimed their unlawful conduct at the United States.

58.    Defendants' U.S. subsidiaries played an important role in implementing the Cartel Agreement.  Defendants' U.S. subsidiaries entered into Franchise Agreements to sell German Cars in the United States and negotiated with U.S. regulators to meet safety and emission requirements.  Defendants' U.S. subsidiaries acted as agents to their German parents in connection with the sale and marketing of German Cars.

59.    Despite their reported disclosures of wrongdoing to government authorities, Defendants have made no public declaration that they will stop entering into horizontal agreements on quality, output, or price.  Defendants have not identified any safeguards that they propose to implement in trade association meetings to prevent such agreements.  Consequently, given the extraordinary duration of the Cartel Agreement, injunctive relief is warranted to ensure that Defendants' unlawful conduct has ceased and will not happen again.

## IX.    DEFENDANTS FRAUDULENTLY CONCEALED THE CARTEL AGREEMENT

60.    Plaintiff had no knowledge of, nor any reason to suspect the existence of, the Cartel Agreement until it was first publicly disclosed on July 21, 2017 in an article published by the German magazine *Der Spiegel*.  Plaintiff did not know of the Cartel Agreement before July 2017 because Defendants affirmatively concealed its existence.  In internal communications, Defendants acknowledged that their discussions and meetings were secret.  One Audi email, for example, reads:  "Hello everyone, here is the information on the 'secret' meeting in Munich." Defendants met under cover of supposed legitimate trade association meetings to avoid arousing

any suspicion of unlawful conduct.[30]  In one meeting held on October 1, 2010, in Paris, members of one working group reminded the others not to record anything sensitive in writing.[31]

61.    In 2011, the European Commission fined Daimler more than $1 billion for participating in a 14-year conspiracy to inflate truck prices.  This caused Daimler to become more careful about cartel compliance, but managers refused to stop conspiring because "otherwise [they] cannot sell cars anymore."[32]

62.    Defendants made numerous fraudulent statements to create the false appearance of competition and to conceal the Cartel Agreement.  For example:

(a)    Daimler's top executive, Dieter Zetsche, falsely boasted that the German Defendants vigorously compete, stating "as neighbors, we are constantly stepping on each other's toes. In this sense, competition is an incredibly good thing."[33]

(b)    Harald Krueger, CEO of BMW, said, "This competition constantly motivates us to achieve excellence."[34]

(c)    Volkswagen CEO Matthias Mueller praised the rivalry of the German Car brands.[35]

(d)    Audi CEO Rupert Stadler said that competition had "given us all a technological advantage."[36]

---

[30] Dohmen and Hawranek, supra n.7.

[31] Von Klaus Ott, *Wie die Autokonzerne alle Warnsignale ignorierten*, Suddeutsche Zeitung, July 24, 2017, http://www.sueddeutsche.de/wirtschaft/auto-kartell-wie-die-autokonzerne-alle-warnsignale-ignorierten-1.3599806, incorporated by reference.

[32] Ott, supra n.31.

[33] Dohmen and Hawranek, supra n.7.

[34] Dohmen and Hawranek, supra n.7.

[35] Dohmen and Hawranek, supra n.7.

[36] Dohmen and Hawranek, supra n.7.

## X.    CLASS ALLEGATIONS

63.    Plaintiff brings this Complaint as a direct purchaser class action on behalf of itself

and all others similarly situated under Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of

Civil Procedure.  The Direct Purchaser Class is defined as:

> All persons or entities (other than Defendants, their parent
> companies, subsidiaries and affiliates, and any co-conspirators) that
> purchased German Cars directly from a Defendant at any time
> between January 1, 1995 and such time as the effects of the
> unlawful conduct ceased.[37]

64.    This action has been brought and may properly be maintained as a class action

under Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.    The Direct Purchaser Class is ascertainable and class members are readily

identifiable through business and/or sale records;

b.    While the exact number of Direct Purchaser Class members is unknown to

Plaintiff at this time, based on the nature and volume of trade and commerce involved,

Plaintiff believes that the number of Class members is very large, and therefore joinder of

all Class members is not practicable;

c.    Plaintiff's claims are typical of the Direct Purchaser Class members'

claims because Plaintiff and the Class members are dealerships that directly purchased

German Cars manufactured by Defendants and their co-conspirators, and therefore

Plaintiff's claims arise from the same common course of conduct giving rise to the claims

of the members of the Class and the relief sought is common to the Class;

d.    The following common questions of law or fact, among others, exist as to

---

[37] Also excluded are named co-conspirators, any federal, state or local government entities, any
judicial officer presiding over this action and the members of his/her immediate family and
judicial staff, and any juror assigned to this action.

the members of the Class:

- Whether the Defendants and their co-conspirators entered into the Cartel Agreement;

- Whether the Cartel Agreement violated the Sherman Act;

- The identity of the participants in the Cartel Agreement and their respective roles in implementing the conspiracy;

- The duration and scope of the Cartel Agreement;

- Whether the Cartel Agreement caused injury to the business or property of Plaintiff and the other members of the Direct Purchaser Class;

- The degree and nature of harm suffered by Plaintiff and the other members of the Direct Purchaser Class as a result of Defendants' violation of Section 1 of the Sherman Act;

- Whether the Defendants fraudulently concealed the Cartel Agreement;

- The appropriate injunctive and related equitable relief for the Direct Purchaser Class; and

- The appropriate measure of damages for the Direct Purchaser Class.

e.    These and other questions of law and fact common to the members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages;

f.    Plaintiff will fairly and adequately represent and protect the interests of the Class in that Plaintiff has no interests that are antagonistic to other members of the Class and has retained counsel competent and experienced in complex antitrust and class action litigation to represent it and the Class; and

g.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be

encountered in the management of this class action.  The damages or other financial

detriment suffered by Plaintiff and the members of the Class are relatively small

compared to the burden and expense that would be required to litigate these issues on an

individual basis.

## XI.    CLAIM FOR RELIEF:  VIOLATION OF SHERMAN ACT SECTION 1

65.    Plaintiff incorporates by reference the preceding paragraphs as if fully set forth

herein.

66.    In or about January 1996 (the precise date is not presently known or knowable)

through at least July 2016, Defendants engaged in a continuing contract, combination, and

conspiracy in restraint of trade.

67.    The Cartel Agreement constitutes a *per se* violation of Section 1 because it was a

horizontal agreement to reduce product quality, reduce output, deter innovation, allocate market

share, and limit competition in the United States market for luxury cars.  The Cartel Agreement

increased prices Plaintiff and all direct purchasers of German Cars in the U.S..

68.    But for Defendants' conspiracy, Defendants would have competed on quality and

price in the United States market for luxury cars.

69.    As a direct and proximate result of Defendants' conduct, members of the Direct

Purchaser Class were injured and damaged in their business and property in an amount to be

determined according to proof.  Plaintiff's injuries arose directly from the domestic effects of the

Cartel Agreement.

## XII.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court:

70.    Determine that this action may be maintained as a class action under Rules 23(a),

23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure;

71.    Enter judgment for Plaintiff and the Direct Purchaser Class awarding Plaintiff and the Direct Purchaser Class their full damages for all economic, monetary, actual, consequential, and compensatory damages that Plaintiff suffered as a result of Defendants' unlawful and/or inequitable conduct;

72.    Award treble damages for violations of the Sherman Act;

73.    Award attorneys' fees and costs of suit;

74.    Enjoin Defendants from making horizontal agreements on quality, output or price; and

75.    Grant such other further relief as allowed by law.

## XIII.    JURY DEMAND

Plaintiff and the Direct Purchaser Class request a trial by jury, pursuant to Rule 38 of the Federal Rules of Civil Procedure.

DATED this 27th day of September, 2017

Respectfully submitted,

ZELLE LLP

By:  _/s/ Jonathan MacBride_

Jonathan R. MacBride
ZELLE LLP
401 Plymouth Road
Suite 120
Plymouth Meeting, PA 19462
Tel:  484-532-5330
E-mail:  jmacbride@zelle.com

James R. Martin
Jennifer Duncan Hackett
Miriam R. Vishio
ZELLE LLP
1775 Pennsylvania Avenue, NW, Suite 375
Washington, D.C. 20006
Tel:  202-899-4100
E-mail:  jmartin@zelle.com
E-mail:  jhackett@zelle.com

E-mail:  mvishio@zelle.com

Christopher T. Micheletti
Judith A. Zahid
Qianwei Fu
ZELLE LLP
44 Montgomery Street, Suite 3400
San Francisco, CA 94104
Tel:  415-693-0700
E-mail:  cmicheletti@zelle.com
E-mail:  jzahid@zelle.com
E-mail:  qfu@zelle.com

Dennis George
Jeffrey Scafaria
ARANGIO GEORGE, LLP
2000 Market Street
Suite 1440
Philadelphia, PA 19103
Tel: 215-567-1999
E-mail:  dgeorge@arangiogeorge.com
E-mail:  Jeff@ScafariaLaw.com

*Attorneys for Plaintiff*

26